**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

EMMA HILL and WILLIAM HILL,

          Plaintiffs,

     v.

KONECRANES, INC.; and MORRIS
MATERIAL HANDLING, INC.,

          Defendants.

CIVIL ACTION NO.: 4:17–cv–165

## O R D E R

This matter is before the Court on Defendants' Motion for Summary Judgment.  (Doc. 32.) For the reasons set forth below, the Court **DENIES** Defendants' Motion.

This lawsuit arises out of a fatal crane accident that occurred in June of 2015 inside a paper plant in Augusta, Georgia owned by International Paper Company ("IP").  Plaintiffs' son, Michael John Hill, worked for IP and was operating a gantry crane ("the crane") within the plant when a gust of wind pushed the crane down the tracks resulting in a collision that derailed the crane.  The collision and derailment caused Mr. Hill to be ejected from the crane's cab, and he fell to his death. The crane was designed to be equipped with four storm brakes to prevent such an accident by stopping the crane from traveling during a wind event.  Unfortunately, however, at the time of the incident, only one of the crane's storm brakes was functional.

Defendants were aware of deficiencies with the crane's storm brakes prior to the accident. Defendants had overhauled and refurbished the crane years before the incident, and they later entered into a contract to inspect, repair, and maintain the crane.  They inspected the crane on five occasions in 2014 and performed several repairs to the crane during the first six months of 2015

including days before the incident.  While IP had an in-house maintenance department that performed some services on the crane, IP relied upon Defendants to periodically inspect the crane, to notify IP of needed repairs to the crane, to prioritize those repairs, and to warn IP if any deficiencies with the crane posed a safety risk or warranted shutting the crane down.  However, prior to the incident, Defendants failed to prioritize repairs to the crane's storm brakes and failed to apprise IP of the risks associated with the condition of the storm brakes.  Additionally, the operating manual that Defendants drafted when they overhauled the crane years prior to the incident did not apprise IP and operators of the crane of the maximum wind speed in which the crane could be safely operated or the minimum number of storm brakes necessary to operate the crane safely.

Plaintiffs sued Defendants seeking to hold them accountable for Mr. Hill's death. Following a significant amount of discovery and in the midst of a bevy of pleadings, Defendants filed the instant motion arguing that they are entitled to summary judgment on all of Plaintiffs' claims.  Defendants' arguments for summary judgment are vague and poorly advanced. Nonetheless, the Court has reviewed the record in this case and measured it against Defendants' contentions.  As explained below, that review reveals sufficient evidence for a reasonable jury to find that Defendants' negligence proximately caused Mr. Hill's death.

## BACKGROUND[1]

Mr. Hill worked for IP at its plant located in Richmond County, Georgia.  (See doc. 1-2, pp. 5–6.)  IP used the crane to move timber within an area of the plant known as the Woodyard. (Id.; doc. 33, p. 2; doc. 49, p. 2.)  Years before the accident, Defendant Morris Material Handling, Inc. ("Morris Material") became the successor to the company that had manufactured and installed

---

[1]  The Court describes the following facts construing all reasonable inferences and resolving all factual disputes in Plaintiffs' favor as it must at this stage.

the crane at IP's plant.  (Doc. 56-1, p. 10.)  Defendant Konecranes, Inc. ("Konecranes") later purchased Morris Material.[2]  (Id.)  After that purchase, in 2008, Defendants performed an overhaul and modernization of the crane including changing the controls, updating the motors and drives, and adding storm brakes.  (Id.)

Following the modernization, the crane had two types of braking systems: gantry (or "holding" or "operating") brakes and storm (or "emergency") brakes.  (Doc. 48-2, p. 3; doc. 48-8, pp. 3–4; doc. 56-1, p. 16.)  The twelve gantry brakes held the drive motors—and, thus, the crane—in place during operations when the crane was not traveling.  (Doc. 48-2, p. 3; doc. 48-8, pp. 3–4.)  The four storm brakes were hydraulically-released friction brakes that pressed directly against the crane's rails.  (Doc. 48-2, p. 3; doc. 48-8, pp. 4–5.)  The storm brakes were designed to stop the crane during a weather event or other emergency.  (Doc. 48-2, p. 3; doc. 48-8, pp. 4–5.)  The cab of the crane had an emergency stop button that, when pushed, should have set all of the storm brakes and stopped the crane.  (Doc. 48-2, p. 3; doc. 48-8, p. 9.)  Additionally, if the crane lost power, the storm brakes should have automatically engaged.  (Doc. 48-2, p. 3; doc. 48-8, p. 9.)  In a wind event or other emergency, the storm brakes were the only means to stop the crane if the gantry brakes failed to do so.  (Doc. 56-1, p. 15.)  Thus, the storm brakes were designed to protect the crane and the crane's operator, (id. at pp. 15–16), and "were a critical safety feature for safe crane operations as well as emergency situations," (doc. 48-2, p. 16).

At the time of the 2008 overhaul and modernization, Defendants created and provided to IP an "entirely new" operating manual for the crane ("the manual").  (Doc. 56-1, p. 11; doc. 48-

---

[2]  Throughout their briefs, the parties make no distinction between Konecranes and Morris Material and treat them as one and the same.  Though much of the discovery materials, including depositions attached to the parties' pleadings, refer only to "Konecranes" and not "Morris Material," the parties do not make this distinction in their briefs.  Defendants make no argument for summary judgment specific to one Defendant or the other.  Consequently, the Court will follow the same course and will simply refer to Morris Material and Konecranes collectively as "Defendants."

4.)   The manual addressed the operation and maintenance of the entire crane—not just the modernized components. (Doc. 56-1, pp. 11–12.)  Aside from the manual, from the time the crane was modernized in 2008 to the date of Mr. Hill's death in 2015, Defendants did not provide IP with any guidelines or manuals regarding the operation of the crane, the storm brakes on the crane, or the wind speeds in which it was safe to operate the crane.  (Id. at pp. 12, 53–54, 56.)

Because there are multiple design elements that may vary from crane to crane, the maximum wind speed in which a specific crane can be operated safely is unique to that crane.  (Id. at p. 53.)   Thus, IP would not have known the crane's maximum safe wind speed without Defendants providing that specific information to it.  (Id.)  However, the manual did not specify the safe wind speed and, following the 2008 modernization and prior to the accident, Defendants never informed IP of the maximum wind speed in which to safely operate the crane.  (Id. at pp. 53–54, 61–62.)  The manual did include the following warning: "Do not operate the crane in high winds.  If the weather becomes threatening, move the crane to the parking area.  Stop crane operation, tie down the crane, and set the storm brakes."  (Doc. 48-4, p. 23.)  Yet, the manual did not define "high winds" or provide any information regarding how the number of operable brakes affected the maximum safe wind speed.  (Id.)  Similar to the safe wind speed, absent some information from Defendants, IP would not have known the number of functional storm brakes necessary to safely operate the crane.  (Doc. 56-1, p. 60.)  However, the manual did specify the number of functional storm brakes or gantry brakes required for safe operation.  (See doc. 48-4; doc. 48-1, p. 14.)

It is standard industry practice for a crane owner or user, like IP, to hire a crane inspection company, like Defendants, to inspect cranes and "identify conditions and deficiencies that require attention."  (Doc. 48-2, p. 15.)  In such a relationship,

4

when the third party inspection company identifies conditions and/or deficiencies that require immediate attention prior to further operation, it is standard practice in the industry for the third party inspection company to immediately notify the crane owner/user of the conditions as well as emphasiz[e] the urgency of the repairs.  For example, when the conditions of a crane affect the safe operation of the crane, it is incumbent on the inspection company to recommend to the crane owner or user that the equipment not be used until such repairs are completed that would bring the crane back to a condition in which it is safe to operate the crane. This is commonly referred to as red-tagging a crane, or removal from service.

(Id. at pp. 15–16.)  Additionally, where the inspection company is also the manufacturer of the crane, as Defendants were as to IP's crane,[3] "there is a reasonable expectation that the inspection company/manufacturer has superior knowledge beyond the owner/user in all aspects of the crane's design and construction characteristics and limitations."  (Id. at p. 16.)  Given that superior knowledge, a crane owner/operator like IP should reasonably expect the inspection company/manufacturer "to correctly identify and promptly warn against any such conditions or deficiencies, particularly safety critical components such as the braking system of the involved crane."  (Id. at p. 16.)

In November 2013, IP hired Defendants to "provide all supervision, labor, equipment and tools to perform inspections, maintenance and repair services to [IP's] overhead cranes, hoists, and wood yard cranes at [IP's] facilities" including the plant in Augusta.  (Doc. 48-3, p. 1.)[4]  Because Defendants are "expert[s] on cranes," they were hired by IP to identify any problems, recommend repairs and parts replacement, prioritize the severity of any repairs and replacements, and identify emergency hazards.  (Doc. 56-1, p. 19.)  While IP had an in-house maintenance department that worked on equipment in the plant including the crane, IP relied upon the "expertise" of contractors

---

[3]  Plaintiffs contend that, following the modernization and overhaul in 2008, Defendants became the manufacturer of the crane.  Defendants never specifically dispute this contention.

[4]  Defendants also inspected the crane on some occasions prior to entering into this contract.  (Doc. 56-1, pp. 16–17.)

like Defendants.  (Doc 48-5, pp. 3–4.)   Specifically, IP's maintenance department relied on Defendants to identify "hazardous conditions," to tell IP if "a condition was unsafe and someone shouldn't operate the crane," to "provide . . . warnings about the crane," and to inform IP "if there were certain conditions that the crane was in that would prevent the crane from being operated in [] normal circumstances" and in "storm circumstances," if "there's a condition that would prompt the crane to need to operate in a different manner under storm circumstances," and "if the crane could not operate safely."  (Id. at p. 8.)

Defendants and IP's agreement called for Defendants to inspect the crane five times per year through four quarterly inspections and one structural inspection.  (Doc. 56-1, p. 13.)  These inspections were supposed to cover gears, brakes, control panels, bearings, motors, and structural and electrical components.  (Doc. 48-3, p. 11.)  As part of each inspection, the inspector was to operate the crane to ensure that all brakes, including all four storm brakes, functioned properly.  (Doc. 56-1, pp. 15–16.)  Defendants were to provide a report to IP directly after an inspection and then to provide a written report of the inspection within ten days of the inspection.  (Id. at pp. 13–14; doc. 48-3, p. 11.)  The contract provided that "[w]hen emergency repairs are identified by the [Defendants'] inspection personnel, these shall be communicated immediately to the appropriate [IP] personnel in the impacted area."  (Doc. 48-3, p. 11.)  The written report was to provide an overall evaluation of the security of the crane and to identify all problems the inspector discovered along with a description of the priority of each problem.  (Doc. 56-1, pp. 13–15.)

If Defendants' inspector identified any need for "emergency repairs," the inspector should have notified IP immediately.  (Id. at p. 16.)  If an inspector identified any needed repairs to the storm brakes, those repairs could qualify as emergency repairs, and the inspector should have communicated any problems with the storm brakes to IP immediately.  (Id. at pp. 15–16.)

Defendants used a numeric system to prioritize conditions needing repair, and that system allowed Defendants to indicate if a condition was life threatening.  (Id. at pp. 22–23.)  The system included a classification of "10" which indicates: "Caution.  Potential danger.  Do not use.  Conditions which may lead to dangerous consequences.  May be life-threatening conditions."  (Id. at p. 23.)  A classification of "10" would communicate to IP "do not use" the crane.  (Id.)  As part of an inspection, Defendants could recommend to IP that the crane be shut down until the necessary repairs were made.  (Id. at pp. 19–20, 50–51; see also doc. 48-12, pp. 21–22 (deposition of Defendants' employee Seth Perkins) ("[If, after an inspection, a crane is] in the current condition [of] a life-threatening situation, then we're going to let them know, Hey, our recommendation is to lock this out . . . .").)

Defendants inspected the crane on five occasions in 2014, with the last inspection occurring in December 2014.  (Doc. 56-1, p. 17.)  The reports for those inspections indicate that Defendants failed to inspect and/or document the condition of two of the crane's four storm brakes during each inspection.  (Id. at pp. 27–30.)  Defendants did not use their classification code "10" in regard to the crane's storm brakes on any of the inspection reports, and Defendants never otherwise communicated to IP that the crane should not be used due to an issue with the storm brakes.  (Id. at pp. 30–31.)

During the December 2014 inspection, five of the crane's twelve gantry brakes were missing and only one of the four storm brakes was functioning properly.  (Id. at pp. 21–22.)  One storm brake would not be able to stop the crane in a weather event, and the absence of the three storm brakes is a "life-threatening condition" particularly when combined with the five missing gantry brakes.  (Id. at p. 22.)  However, at the conclusion of the December 2014 inspection, Defendants did not tell IP that the condition of the crane required it to be shut down or that a life-

threatening condition existed as to the crane.  (Id. at pp. 20, 23, 30–31.)  Defendants, who had had routinely failed to provide inspection reports to IP within the required ten-day period, did not provide a written detailed report for the December 2014 inspection until June 25, 2015, six months after the inspection and three days after Mr. Hill's death.  (Id. at p. 42; doc. 48-5, p. 17.)

Though IP continued to operate the crane in 2015, Defendants did not inspect the crane at any point that year until after Mr. Hill's death in late June.  (Doc. 56-1, p. 17.)  IP relayed that, prior to having another inspection performed, it wanted Defendants to complete certain repair work they were doing to the crane's pins and other non-brake-related items.  (Id. at p. 44–45.)  While there is some indication that Defendants requested dates from IP for an inspection in early to mid-June, there is no indication in the record that Defendants advised IP that the inspections could and should still take place despite the ongoing repair work.  (Id. at p. 45.)

Additionally, throughout the first half of 2015, IP made six different purchase orders to Defendants for services on the crane, and "[IP] had [Defendants] in there working on that crane [periodically] from the time of the December 2014 inspection through the time of the incident." (Id. at p. 18.)   During that period, Defendants' representatives intermittently spent twelve to thirteen days at IP's plant repairing items on the crane that they identified in their December 2014 inspection of the crane.  (Id. at pp. 18, 31–36, 41–43.)  "IP was following the recommendations of [Defendants] and attempting to get repairs made."  (Id. at p. 43.)  IP relied upon Defendants to prioritize the repairs they made in 2015, and Defendants did not repair the crane's nonfunctional storm brakes.  (Id. at p. 44.)

In fact, in March of 2015, IP specifically notified Defendants that one of the crane's storm brakes was broken and asked if Defendants could repair or replace it as soon as possible.  (Id. at pp. 36–37.)  Defendants then arranged for IP to remove the storm brake from the crane and ship it

to Defendants for an inspection.  (Id. at p. 37.)  Though Defendants stated the inspection would take three weeks, they took approximately two months to inspect the storm brake and provide the results to IP.  (Id. at pp. 37–38.)  IP then relayed to Defendants that it would like to purchase a new storm brake, but Defendants did not provide the new storm brake prior to the incident.  (Id. at pp. 38, 40.)  During this time, Real Saucy, Defendants' employee who primarily handled the communications with IP regarding the crane, knew everything that was being done with the crane including the status of the storm brakes and the removal of the one storm brake for repair or replacement, giving him the necessary information to determine how many storm brakes were actually on the crane.  (Id. at p. 39 (Defendants' testimony that "[h]e had the information in front of him").)  Additionally, all of Defendants' employees who were involved in Defendants' woodyard service business had access to records reflecting those conditions.  (Id.)  Further, Mr. Saucy had the knowledge and opportunity to tell IP that the removal of the storm brake posed a safety risk.  (Id. at p. 40 ("Q: . . . [W]ell, at this point, I guess, if [Mr. Saucy] knows he's taking one storm brake off, should he have said, 'This is a potential problem in a storm environment?'" "A: He had the knowledge to be able to say that, yes.").)  However, he did not do so.  (Id.)  Further, while Defendants normally offer spare parts for a customer when they are repairing or replacing a part that is removed from a crane, they did not do so in this instance.  (Id. at pp. 40–41.)  Defendants also provided no warnings to IP upon the removal of the storm brake.  (Id. at p. 41.)

At their deposition taken pursuant to Federal Rule of Civil Procedure 30(b)(6), Defendants agreed that the status of the crane's storm brakes as of December 2014 was unclear because Defendants failed to document and/or inspect them.  (Id. at p. 56.)  Defendants also agreed that, in March of 2015, they knew at least one storm brake was not working.  (Id.)  Plaintiffs' counsel then questioned Defendants,

> At that point in time, did Konecranes have any obligation to tell the customer, "Hey, you, at least, have one storm brake out of service. You may have two storm brakes out of service. You may have all storm brakes out of service, for all we know." Did they have some obligation to tell them what the risks were associated with that?

(Id.)  Defendants responded, "Yes."  (Id.)  Plaintiffs' counsel then asked Defendants if they fulfilled that obligation, and they responded that they "didn't see any documentation or a verbal confirmation that [they were] aware of."  (Id.)

In April of 2015, at IP's request, Defendants created a list of equipment and critical issues in need of repair at various IP locations.  (Id. at pp. 43–44.)  As to the crane involved in the incident, Defendants only listed wear on the crane's pin.  (Id.)  Defendants did not list anything regarding the storm brakes despite knowing that at least one storm brake had been removed and that problems with the storm brakes identified during inspections of the crane had not been remedied.  (Id.)

Days before the incident, on June 19, 2015, Defendants worked on the crane's hoist motor and gear box.  (Id. at pp. 18, 35–36.)  Defendants' representatives "readily observed the condition of the crane" when preforming these repairs.  (Id. at p. 36.)  Those representatives did not inform IP that the condition of the storm brakes presented a life-threatening situation or that the crane should be taken out of service until the storm brakes were repaired.  (Id. at pp. 35–36.)

On June 22, 2015, Mr. Hill's supervisors at IP instructed him to operate the crane as part of his normal job responsibilities.  (Doc. 48-2, pp. 3–5.)  As he was performing pre-shift checks within the cab of the crane, heavy winds caused the crane to suddenly travel down its rails.  (Id.; doc. 48-8, p. 8.)  Mr. Hill attempted to activate the storm brakes by pressing the crane's emergency stop button.  (Doc. 48-2, pp. 3–5.)  Additionally, as the crane traveled down the rails, its power line was cut causing the crane to lose power, which should have automatically engaged the storm brakes.  (Id.)  The crane did not stop, and it eventually crashed into stops on one end of the tracks, causing two of the crane's legs to derail.  (Id.)  The force of the collision and derailment caused

the cab of the crane to become dislodged from the crane structure, and Mr. Hill was ejected from the cab and fell to his death.  (Id.)  Post-accident inspection of the crane revealed that though the crane was supposed to be equipped with four functioning storm brakes, only one storm brake functioned properly during the incident.  (Doc. 48-8, p. 8.)

Plaintiffs filed this lawsuit on February 21, 2017 in the State Court of Chatham County, Georgia, (doc. 1-2), and Defendants subsequently removed the case to this Court, (doc. 1).  Plaintiffs specifically accuse Defendants of several acts and omissions that Plaintiffs contend caused the accident, and they generally allege that Defendants' negligence caused Mr. Hill's wrongful death.  (Doc. 1-2, pp. 8–9.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to

support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. (citation and emphasis omitted).

## DISCUSSION

Defendants filed the instant Motion arguing that they are entitled to summary judgment on all of Plaintiffs' claims.  (Doc. 32.)  Defendants contend that "[e]very singled [sic] needed repair to the crane at issue was identified by Konecranes.  This entire lawsuit is premised on a claim that Konecranes should have been *more* assertive in demanding that International Paper shut down its crane until properly identified repairs were made.  No such cause of action exists."  (Id. at p. 1.) Defendants' arguments are at times imprecise, but they can be culled down to the following: that the crane accident was not foreseeable to Defendants, that IP's acts or omissions broke any causal connection between Defendants' negligence and the accident, and that Defendants had no duty to warn of any dangers because IP was a "sophisticated user/learned intermediary."  (Id. at pp. 5–12.)

In their Response, Plaintiffs contend that Defendants, as the manufacturers of the crane, had a duty to warn Mr. Hill and IP of the minimum number of brakes needed to safely operate the crane and the maximum safe wind speed in which to operate the crane, but that they failed to provide these warnings in the manual.  (Doc. 48, pp. 2, 8–12, 16–17.)  Plaintiffs also argue that, as the inspectors and servicers of the crane, Defendants breached their duty to warn IP and Mr. Hill of dangerous conditions, to identify emergency repairs, and to recommend that IP not operate the crane in its dangerous condition.  (Id. at pp. 2, 12–17.)  Additionally, Plaintiffs argue extensively that Defendants' negligence proximately caused Mr. Hill's death, (id. at pp. 17–23), and that their failure to warn claims are not barred by the learned intermediary doctrine, (id. at pp. 23–25).  In their Reply, Defendants argue, among other things, that Plaintiffs have improperly attempted to assert, through their Response, a products liability claim that they did not plead in their Complaint.  (Doc. 52, pp. 2–4.)

Plaintiffs filed a Supplemental Brief arguing that Defendants' asserted grounds for summary judgment were further undermined by three developments that occurred following the prior briefing: (1) the Court's exclusion of Defendants' expert witness's opinions; (2) the deposition of Defendants pursuant to Federal Rule of Civil Procedure 30(b)(6); and (3) the Defendants' shift in position regarding remedial measures.  (Doc. 60.)  Defendants then filed a Surreply standing by all the arguments raised in their prior briefs and arguing that the developments identified by Plaintiffs had no bearing on their Motion.  (Doc. 63.)

## I.    Deficiencies in Defendants' Briefs

Prior to delving into the substance of the parties' arguments, the Court must unfortunately address disconcerting deficiencies that plague Defendants' briefs.  The Court does not point out

these errors merely to chide Defendants or their counsel.[5]   Rather, the Court must discuss Defendants' mistakes because many of them go the heart of the parties' claims and defenses. Further, Defendants' deficiencies have required the Court to expend unnecessary time and resources examining the record and trying to make sense of Defendants' contentions.

Defendants' arguments are poorly organized and delineated, making it difficult for the Court to decipher their positions.[6]   More concerningly, Defendants make a number of material statements throughout their briefs that directly contradict the evidence of record including their own testimony.   The following are examples of this concerning pattern:

- Defendants repeatedly misrepresent that they provided IP the detailed written report of their December 15, 2014 shortly after the inspection and that the report sufficiently described problems with the crane's storm brakes.   In their opening brief, Defendants contend: "Konecranes actually warned IP of the Crane's deficiencies. On or around December 15, 2014, Konecranes inspected IP's Crane, conducted an exit interview, and

---

[5]  Indeed, Defendants' counsel has a sound record before this Court, and the Court does not find that these deficiencies are due to any bad faith or intent by Defendants' counsel.  The Court attributes the mistakes noted herein to inattention combined with overzealousness or other reasons well short of ill intent.

[6]  For example, within their argument on causation, Defendants flatly claim they did not breach any duty or standard of care.  (Doc. 32, p. 7 ("Although Plaintiffs allege that Defendants were negligent, the record shows that Defendants did not breach any duty owed to the Decedent.").)  However, they never address the confines of the duties that they actually owed (even after Plaintiffs specify certain duties in their briefs) or offer any evidence or argument in support of their position.  Rather than grappling with Plaintiffs' arguments, Defendants continue to rely on conclusory and hyperbolic statements with no supporting facts or reasoning.  (See, e.g., doc. 52, p. 7 ("The ironic thing is that if there were no workers compensation bar, Plaintiffs would be relying on Konecranes as their star witness against IP, instead of attempting to hold the Defendants responsible for something that was obviously not their fault.").)  Additionally, Defendants' Motion and briefs fail to comply with this Court's Local Rule 7.1(b) which prescribes that "[e]very factual assertion in a motion, response, or brief shall be supported by a citation to the pertinent page in the existing record or in any affidavit, discovery material, or other evidence filed with the motion."  Rather than citing to record evidence, Defendants cite to their own Statement of Undisputed Material Facts.  (See, e.g., doc. 32, pp. 2–3.)  While that Statement contains record citations, the assertions within the Statement themselves are argumentative and conclusory with little actual factual content.  (See doc. 33.)  Further, the link between many of the assertions and the supporting citations in the Statement are murky if not suspect. (Id.)

provided inspection documents to IP representatives." (Doc. 32, p. 10; <u>see also</u> <u>id.</u> at p. 6 ("The only question in-front [sic] of the court is this: on December 15, 2014, . . . were there any imminent safety risks that Konecranes negligently omitted informing IP about. The answer is no.").) To support this position, Defendants cite a report titled "Crane Condition Detail." (Doc. 32, p. 10 (citing doc. 33-4); doc. 52, p. 4 (citing doc. 33-4).)[7] The Crane Condition Detail report, (doc. 33-4), does indeed document and prioritize deficiencies discovered during the December 2014 inspection of the crane. However, the evidence is clear that Defendants failed to provide the report to IP until after the accident in June of 2015. Defendants acknowledged in their deposition that they did not provide that Crane Condition Detail to IP until "six to seven months" after the inspection, (doc. 56-1, p. 42), and their failure to provide the report to IP prior to the accident was well known prior to their deposition, (<u>see</u> doc. 48-2, p. 17 (Plaintiffs' expert noting "Konecranes did not provide an itemized (Crane Condition Detail) report that detailed the severity of these deficiencies until several months after the incident"); doc. 48-5, p. 17 (IP employee Joel Battle testifying that IP did not receive the report until June 25, 2015)). Plaintiffs' Response pointed out the contradiction between this evidence and the representations in Defendants' brief. (Doc. 48, pp. 4, 21 ("[I]t appears Defendants did not even provide the December 2014

---

[7] On this point, Defendants' Reply cites "Exhibit K to Defendant's [sic] Motion of [sic] Summary Judgment." (Doc. 52, p. 5.) However, there are no Exhibits, much less an Exhibit K, to that Motion. In their Motion, Defendants also cite Paragraph Ten of their Statement of Facts, (doc. 32, p. 10), but that Statement in turn cites the Crane Condition Detail report, (doc. 33, p. 2 (citing doc. 33-4).) The Statement of Material Facts also cites the deposition testimony of IP's employee, Joel Battle. (Doc. 33, p. 2 citing (doc. 33-3, pp. 43–44).) However, within the cited excerpts, Mr. Battle only discusses Konecranes' practices generally, and he never specifies that an exit interview was done after the December 2014 inspection, much less that the storm brakes were discussed or that the written report was provided shortly after that inspection. (Doc. 33-3, pp. 42–44.) Moreover, Mr. Battle later testified that he did not receive the written report for the December 2014 inspection until after the fatal crane accident in June of 2015. (<u>Id.</u> at p. 67.)

inspection report to IP until *after* the crane derailed in June 2015.")).  However, Defendants failed to address this contradiction and continued to misrepresent that they provided the inspection report shortly after the December inspection and prior to the fatal accident.  For instance, in their Reply, Defendants contend,

> Konecranes explained the need for repair to the Crane's brakes in the exit interview, and the December 15, 2014, report . . . highlighted the important status of the brakes in Red (both Storm Brakes and Machinery Brakes), listed them as NOT ACCEPTABLE, and give them a "priority 1" designation for repair.  This is 6 months prior to the Incident!

(Doc. 52, p. 5.)  The uncontroverted facts belie Defendants' exclamations.  Moreover, Defendants' deposition highlighted more misrepresentations in their briefs regarding the Crane Condition Detail report.  When testifying, Defendants conceded that, according to the report itself (and, indeed, the reports for all of Defendants' inspections of the crane dating back to January of 2014), Defendants failed to inspect two of the crane's four storm brakes and provided no information to IP regarding the condition of those brakes. (Doc. 56-1, pp. 27–30.)  This, of course, contradicts Defendants' representations to the Court that they fully apprised IP of the status of the inoperable storm brakes shortly after the December 2014 inspection.  Yet, even after Plaintiffs again pointed out to the Court the contradictions between this evidence and Defendants' briefs, (doc. 60, pp. 4-5 n.2), Defendants still failed to own up to their disingenuity, (doc. 63, pp. 1–2 ("Defendants hereby reiterate and incorporate by reference all arguments, conclusions, and citations to authority previously cited in [their] Motion [Doc. No. 32] and Reply [Doc. No. 52].")). This repeated lack of candor on a critical issue gravely concerns the Court.

- In their opening brief, Defendants represent that "Plaintiffs have provided no evidence that Konecranes' inspection failed to conform to the standard required . . . " (doc. 32, p. 6), and

they make other similar statements throughout their briefs.  These representations blatantly disregard the evidence of record.  Plaintiffs provided an expert report in which professional engineers Matthew R. Gardiner and Anthony E. Bond detail several ways that Konecranes' inspections failed to meet the industry standard.  (Doc. 48-2.)  Even the testimony of Defendants' proposed expert, James Pritchett, provides evidence that Defendants' inspectors failed to conform to the industry standard.  (Doc. 48-13, p. 10.)  Rather than addressing that evidence, Defendants represent to the Court that it does not exist.  Even more disturbing is that Defendants' position once again contradicts their own testimony. Again, Defendants testified that they failed to inspect and/or document the condition of two of the four storm brakes in any of their inspections of the crane.  (Doc. 56-1, pp. 27– 30.)  They also stated that problems with the crane's storm brakes constituted a "life threatening condition," (id. at p. 22), but, at the conclusion of the December 2014 inspection, they did not tell IP that the condition of the crane necessitated it being shut down or that any life-threatening condition existed as to the crane.  (Id. at pp. 20, 23, 30– 31.)  Further, Defendants acknowledged that, after IP contacted them in March of 2015 regarding repairs to one of the storm brakes, Defendants had an "obligation to tell [IP] what . . . risks were associated with that," and Defendants failed to meet that obligation.  (Id. at p. 56.)  In light of this wealth of evidence, it strains credulity for Defendants to continue to tell the Court that there is no evidence that their conduct failed to meet the required standard.

- In their briefs, Defendants chide Plaintiffs for making the claim that the crane needed emergency repairs and state "[t]he obvious problem with making the emergency status of the repairs the linchpin of their Response,  is the fact that there was no imminent emergency

on December 15, 2014, the date of the last inspection."[8]  (Doc. 52, pp. 4-5.)  However,

Defendants testified that on the date of that inspection, five of the crane's twelve gantry

brakes were missing or not functioning correctly and only one of the four storm brakes was

functioning, (doc. 56-1, p. 21–22), and that a problem with the storm brakes would

constitute an "emergency repair," (id. at pp. 15–16).  Defendants also frequently represent

that they had no knowledge of the condition of the crane's brakes after December 15, 2014.

(Doc. 32, p. 6 ("The only question in-front [sic] of the court is this: on December 15, 2014,

the last time Konecranes was given permission by IP to inspect the Crane prior to the

Incident, were there any imminent safety risks that Konecranes negligently omitted

informing IP about."); doc. 52, p. 4 ("Konecranes . . . had no knowledge of the condition

of the brakes at the time of the Incident."); id. at p. 5 ("There is no legal cause of action for

Konecrane's [sic] inability to 'see the future,' and warn IP in December of 2014 about

deficiencies that allegedly should have appeared on their report in June of 2015.").  Once

again, Defendants either ignore or misrepresent the evidence.  Defendants performed

several repairs to the crane in 2015 including days before the accident, and they admit that

they were able to "readily observe" the crane's condition during that time.  (Doc. 56-1,

pp. 18, 31–36, 41–43.)  Moreover, in March of 2015, IP contacted Defendants to repair or

replace one of the crane's storm brakes, and Defendants were aware that at least that brake

was missing from the crane at the time of the incident.  (Id. at pp. 36–40.)  Defendants

further testified that, during this time, Mr. Saucy, their employee who was  the primary

---

[8]  Defendants reason, "[o]bviously, there was no imminent emergency repairs needed on December 15,
2014, because the Crane functioned properly for another six months, without incident."  (Doc. 52, p. 5.)
This is illogical.  Just because a dangerous condition does not result in injury immediately or even for a
period of time does not mean it is not dangerous.  A vehicle's driver who sped down the road at 100 miles
per hour and collided into another vehicle will not be heard to say that his speed of travel posed no imminent
threat because he traveled at that speed previously without incident.

contact with IP's facility, knew everything that was being done with the crane and "had the information in front of him" to determine the status of the storm brakes, and anyone that was involved in Defendants' woodyard service business also had access to records reflecting those conditions. (Id. at p. 39.) Again, based on these facts, Defendants testified that they had an obligation to notify IP of the condition of the storm brakes and associated dangers but they failed to do so. (Id. at p. 56.) Consequently, Defendants' representations to the Court that they did not know and could not have known of the condition of the crane after the December 15, 2014 inspection lacks credibility.

The Court cites Defendants' Rule 30(b)(6) deposition, (doc. 56-1), for many of these contradictions. In fairness, that deposition occurred after Defendants filed their Motion for Summary Judgment, (doc. 32), and Reply, (doc. 52). However, as that deposition contained Defendants' own knowledge, it is concerning that Defendants made representations in their briefs that they later contradicted once placed under oath. Moreover, much of the information that contradicts Defendants' briefing positions was known through discovery prior to Defendants' deposition. The Court cites Defendants' testimony because it is the most glaring evidence of the contradictions between Defendants' briefs and the evidence of record. Furthermore, after Defendants' deposition, Plaintiffs filed a Supplemental Brief pointing out that Defendants' deposition testimony undercut their Motion and supporting arguments. (Doc. 60, pp. 2–8.) Defendants, however, refused to back down from any of their positions or arguments and instead reiterated the entirety of their prior briefs. (Doc. 63, p. 1.) Indeed, Defendants "doubled down" and argued that Plaintiffs misrepresented their deposition testimony and that their testimony actually supports their Motion for Summary Judgment. [9] (Id. at pp. 4–6.) However, the Court has

---

[9] While Defendants cite select excerpts of their testimony, they "implore the Court to review the attached transcript and determine what [their corporate representative] actually testified to." (Id. at p. 4.) However,

reviewed Defendants' testimony, and it severely undercuts many of the arguments Defendants offer in their Motion and Reply.  Indeed, the Court cites to Defendants' deposition for nearly the entire Background section of this Order, and that account is quite damning to Defendants.  Thus, Defendants' refusal to revisit any of their briefing positions after their deposition, particularly after Plaintiffs' filed their Supplemental Brief, only compounds the Court's concerns over Defendants' above-described mistakes.

The above-noted deficiencies provide a sufficient, but not complete, representation of the errors in Defendants' briefs and related pleadings.  While those deficiencies alone could provide a sufficient basis for denying Defendants' Motion for Summary Judgment, in the interest of completeness and its preference for addressing matters on the merits, the Court will nonetheless proceed to asses Defendants' arguments.

## II.    Plaintiffs Assert Claims Against Defendants as Manufacturers of the Crane

In their Response, Plaintiffs contend that as the manufactures of the modernized crane in 2008, Defendants owed IP and Mr. Hill a duty to warn of certain foreseeable dangers.  (Doc. 48, pp. 8–12.)  Specifically, they contend that the operating manual Konecranes authored and provided to IP at the time of the modernization should have warned operators to shut down the crane if more than one storm brake was nonfunctional per side and also should have identified the maximum wind speeds in which the crane could be safely operated.  (Id.)  In their Reply, Defendants argue

---

"[j]udges are not like pigs, hunting for truffles buried in briefs."  United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991).  Likewise, judges "are not archaeologists. They need not excavate masses of papers in search of revealing tidbits—not only because the rules of procedure place the burden on the litigants, but also because their time is scarce."  Nw. Nat'l Ins. Co. v. Baltes, 15 F.3d 660, 662–63 (7th Cir. 1994).  They need not endeavor to "fish a gold coin from a bucket of mud."  U.S. ex rel. Garst v. Lockheed-Martin Corp., 328 F.3d 374, 378 (7th Cir. 2003).  Thus, if there are portions of their testimony that Defendants contend support their arguments, they should have pointed those portions out to the Court rather than directing the Court to read the entire transcript.  Nonetheless, the Court has read the entirety of Defendants' deposition testimony.

that these allegations constitute a newfound products liability cause of action.  (Doc. 52, pp. 2–3.)

Defendants essentially maintain that Plaintiffs did not plead such a claim in their Complaint and,

therefore, they cannot raise it at this stage.[10]  (Id.)  In their Supplemental Brief, Plaintiffs explain

that they "have not—and are not trying to—assert strict liability, manufacturing defect, or design

defect product liability claims as Defendants contend."  (Doc. 60, p. 3 n.1.)  Rather, they argue

that their failure to warn claims against Defendants, both as the manufacturers and as the inspectors

and servicers of the crane, are negligence claims with similar elements that relate to work

Defendants performed with respect to the crane.  (Id.)

 The Eleventh Circuit has explained that a plaintiff cannot raise a claim in the first instance

in their Motion for Summary Judgment:

> In Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) the Supreme Court has
> mandated a liberal pleading standard for civil complaints under Federal Rule of
> Civil Procedure 8(a).  This standard however does not afford plaintiffs with an
> opportunity to raise new claims at the summary judgment stage.  Indeed, the
> "simplified notice pleading standard relies on liberal discovery rules and summary
> judgment motions to define disputed facts and issues and to dispose of
> unmeritorious claims."  Id.  Efficiency and judicial economy require that the liberal
> pleading standards under Swierkiewicz and Rule 8(a) are inapplicable after
> discovery has commenced.  At the summary judgment stage, the proper procedure
> for plaintiffs to assert a new claim is to amend the complaint in accordance with
> Fed. R. Civ. P. 15(a).

Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314–15 (11th Cir. 2004); see also Hurlbert

v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006) (holding that plaintiff

must amend the complaint before raising a claim at summary judgment).  "Likewise, district courts

are not permitted to construe an opposition brief as an effective motion to amend the complaint."

---

[10]  Defendants' arguments on this front are not well defined, and do not include sufficient citations to the
record or supporting authorities.  This provides an independent basis for the denial of this portion of
Defendants' Motion.  Nonetheless, in the below analysis, the Court has endeavored to decipher Defendants'
arguments and address the merits of them.  Should the Court's assessment misapprehend or not fully cover
Defendants' intended line of reasoning, that inadequacy should be attributed to Defendants' briefs.

Bruins v. Jake's Fireworks, Inc., No. 1:16-CV-03519-RWS, 2018 WL 8838813, at *4 (N.D. Ga. Aug. 31, 2018) (citing Flintlock Const. Servs., LLC v. Well-Come Holdings, LLC, 710 F.3d 1221, 1227–28 (11th Cir. 2013)).  "This is not to say, however, that a complaint must account for every contingency that may arise, nor should a claim be dismissed simply because it lacks some magic words."  Id. (citing Brisk v. Shoreline Found., Inc., 654 F. App'x 415, 417 (11th Cir. 2016)).  "The standard is as it has long been: a complaint must place the defendant on notice of 'the claim being asserted against him and the grounds on which it rests.'"  Id. (citing Brisk, 654 F. App'x at 417; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

Plaintiffs' Complaint placed Defendants on notice of claims against them as the manufacturer of the crane's modernization in 2008.  Paragraph Fifteen of the Complaint asserted that the crane was "rebuilt, updated, and overhauled by Defendants in 2008."  (Doc. 1-2, p. 6.) Paragraph Sixteen alleged that Defendants "inspected, designed, recommended, supervised, or performed all repairs and upgrades to [the crane] in 2008 and thereafter."  (Id.)  Additionally, Plaintiffs' allegations of Defendants' negligence laid out in Paragraph Twenty-Seven included "failing to properly recommend and design the upgrades to [the crane];" "utilizing a design during the refurbishment and overhaul which failed to incorporate feasible, technologically available, and economically possible designs . . .;" "failing to initiate, maintain, or otherwise provide appropriate safety and precautionary procedures to ensure that [the crane] did not pose a danger or hazard . . .;" and failing to warn "that the condition of [the crane] caused a dangerous and hazardous condition  . . . ."  (Id. at pp. 8–9.)

Moreover, the conduct of discovery in this case indicates that the parties understood that Plaintiffs asserted claims against Defendants in their capacity as manufacturers of the crane and, specifically, as to warnings omitted from the operating manual.  Cf. Bruins, 2018 WL 8838813, at

*4 (disallowing plaintiff to rely upon a negligent recall claim in response to summary judgment because, among other reasons, the reasonableness of the recall "was not a prime topic of discussion during discovery").  During the deposition of IP's employee, Mr. Battle, Plaintiffs' counsel posed questions regarding the manual, and specifically asked whether IP would rely upon Konecranes "for any warnings associated with wind speeds or reduced wind speeds if there are fewer brakes." (Doc. 48-5, pp. 30–31.)  Plaintiffs' experts' report identified numerous warnings that were omitted from the 2008 manual but included in the manual when it was updated after the incident.  (Doc. 48-2, pp. 10–11.)  Those warnings included the maximum wind speed and the minimum number of functioning brakes necessary to safely operate the crane.  (Id.)  Additionally, the expert report stated that as the crane manufacturers, Defendants should have "superior knowledge" of the crane and, with that knowledge, should provide proper and prompt warnings particularly as to "safety critical components such as the braking system." (Id. at p. 16.)  The deposition of Plaintiffs' expert witness Mathew Gardiner also included questions from Defendants' counsel regarding the manual and testimony as to warnings that were not included in the manual.  (Doc. 48-1, pp. 13–15.) Moreover, during the deposition of Defendants' proposed expert, James Pritchett, counsel posed several questions regarding the 2008 manual, and Mr. Pritchett testified as to warnings the manual should have included.  (Doc. 48-13, pp. 18, 21, 24 ("Every crane has its own sail effect. I would think that the manufacturer should have said what wind to be aware of.").)  Likewise, the manual was also discussed during Defendants' Rule 30(b)(6) deposition, and Defendants made several statements that support Plaintiffs' clam that Defendants' omitted critical warnings from the manual.  (Doc. 56-1, pp. 11, 53–54, 59–60.)

Defendants' awareness that Plaintiffs made claims based on deficiencies in the manual is further evidenced by the parties' pleadings.  Prior to filing their Motion for Summary Judgment,

Defendants filed a Motion in Limine to exclude changes to the manual as remedial measures under Federal Rule of Evidence 407.  (Doc 27.)  In response to that Motion, Plaintiffs argued, among other things, that "neither the operator's manual authored by Defendants, nor the inspection reports created by Defendants, contain any reference to the number of brakes necessary to safely operate the crane, the maximum wind speed at which to operate the crane, or the hazards associated with operating the crane without properly functioning storm brakes."  (Doc. 30, p. 2.)

Defendants contend, without much explanation, that allowing Plaintiffs to pursue a "products liability claim" would be "an extreme prejudice" to them.  (Doc. 52, p. 4.)  As a threshold matter, Plaintiffs have asserted that they are not pursuing products liability claims but rather failure to warn claims.  Moreover, Defendants' claims of prejudice ring hollow as they have been aware throughout this action that Plaintiffs asserted claims against them as the manufacturers of the crane and they had the opportunity to conduct discovery on those claims.  As laid out above, the operating manual and the warnings allegedly omitted from it were discussed during fact-based and expert discovery.[11]

For all these reasons, the Court rejects Defendants' arguments that Plaintiffs have not asserted failure to warn claims against them as manufacturers of the crane.  Plaintiffs gave fair notice of their claims that Defendants failed to include sufficient warnings in the manual commensurate with their 2008 overhaul of the crane.  Thus, the Court will include these claims

---

[11]  Additionally, even if Plaintiffs were not allowed to assert distinct claims based on the omissions in the operating manual, evidence of the operating manual's warnings would still likely be introduced at trial. Evidence regarding the operating manual in effect at the time of the incident would help the jury to understand the relationship between Defendants and IP, to assess IP and Mr. Hill's knowledge regarding the crane and any dangers associated with operating the crane, and to evaluate the sufficiency of any warnings provided by Defendants as the inspectors and servicers of the crane.  Thus, Plaintiffs' pursuit of claims against Defendants as manufacturers of the crane will not cause the introduction of unfairly prejudicial evidence.

when assessing whether Plaintiffs produced sufficient facts to withstand Defendants' Motion for Summary Judgment.

## III.    Merits of Plaintiffs' Claims

In this diversity action, the Court must apply the choice-of-law rules of its forum state of Georgia to determine which state's substantive laws apply.  Boardman Petroleum, Inc. v. Federated Mut. Ins. Co., 135 F.3d 750, 752 (11th Cir. 1998).  Here, Plaintiffs' claims against Defendants as both the manufacturer as well as the service provider and inspector of the crane sound in tort.  In tort actions, "Georgia continues to apply the traditional choice of law principles of *lex loci delicti*." Willingham v. Glob. Payments, Inc., No. 1:12-CV-01157-RWS, 2013 WL 440702, at *14 (N.D. Ga. Feb. 5, 2013).  "[T]he rule of *lex loci delicti* . . . requires application of the substantive law of the place where the tort or wrong occurred."  Carroll Fulmer Logistics Corp. v. Hines, 710 S.E.2d 888, 890 (Ga. Ct. App. 2011).  The parties do not dispute that the events giving rise to this action took place in Georgia.  Thus, Plaintiff's claims of negligence are governed by Georgia law.[12] Under Georgia law, "[i]t is well established that to recover for injuries caused by another's negligence, a plaintiff must show four elements: 'a duty, a breach of that duty, causation and damages.'"  Royal v. Ferrellgas, Inc., 563 S.E.2d 451, 454 (Ga. Ct. App. 2002) (quoting Traina Enterps. v. RaceTrac Petroleum, 525 S.E.2d 712, 713 (Ga. Ct. App. 1999)).  The Court will assess whether Defendants have established that they are entitled to summary judgment as to each of these elements.

---

[12]  Moreover, because the parties have only argued Georgia law and have not offered the substantive law of any other state, Georgia law applies.  See Int'l Ins. Co. v. Johns, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989) ("[B]ecause the parties failed to consider the choice of law in this diversity case, we must presume that the substantive law of the forum . . . controls.") (citation omitted).

### A.     Duty

Whether and to what extent Defendants owed Mr. Hill a duty would ordinarily be a question of law to be decided by the Court.  Manker v. Zurich Servs. Corp., 556 F. App'x 907, 908 (11th Cir. 2014) (citing Perkins v. Kranz, 728 S.E.2d 804, 806 (Ga. Ct. App. 2012)).  However, Defendants' only specific arguments that they did not owe a duty to warn are their contentions that IP was a "sophisticated user/learned intermediary."  (Doc. 32, pp. 8–12).  As explained below, those arguments are ordinarily issues for a jury, and this case provides no exception to that rule.  Because Defendants provide no other arguments as to duty, the Court could deny Defendants' Motion as to this element without addressing the contours of Defendants' duties.  However, first addressing Defendants' respective duties as the manufacturers as well as the inspectors and servicers of the crane will make clearer the analysis of Defendants' "sophisticated user/learned intermediary" arguments as well as the other elements of Plaintiffs' claims.

### 1.   Defendants' Duty as Manufacturers

As the manufacturers of the refurbished crane, Defendants had a duty to warn of dangers that they knew or reasonably should have known could arise from use of the crane.  Chrysler Corp. v. Batten, 450 S.E.2d 208, 211 (Ga. 1994) ("In failure to warn cases, the duty to warn arises whenever the manufacturer knows or reasonably should know of the danger arising from the use of its product.") (citations omitted).  Plaintiffs contend that after refurbishing the crane in 2008, Defendants had a duty to warn of dangers including the minimum number of functional brakes necessary to safely operate the crane and the maximum wind speed in which the crane could be safely operated.  (Doc. 48, pp. 8–12.)

The record supports Plaintiffs' position.  The manual addressed the operation and maintenance of the entire crane—not just the modernized components.  (Doc. 56-1, pp. 11–12.)

Defendants testified that they could have included warnings in the manual regarding the storm brakes and safe wind speed prior to the incident.  (Id.)  Defendants further testified that the maximum safe wind speed for the subject crane is unique, IP would not know the safe wind speed unless Defendants specified it, and Defendants did not provide IP with information regarding the maximum safe wind speed in the manual or otherwise. (Id. at pp. 53–54.)  Similarly, absent some information from Defendants, IP would not know the minimum number of storm brakes necessary to safely operate the crane, and Defendants could have warned IP not to operate the crane with more than one nonfunctional storm brake per side in the manual but did not.  (Id. at pp. 59–60.)  Plaintiffs have pointed to evidence, including testimony from Defendants' own proposed expert, Mr. Pritchett, that Defendants had a duty to include this information in the operating manual.  (See Doc. 48-13, pp. 18, 21, 24 ("Every crane has its own sail effect. I would think that the manufacturer should have said what wind to be aware of.").)  Additionally, Plaintiffs' experts opine that as manufacturers of the crane, Defendants should have warned of conditions in the crane, "particularly safety critical components such as the braking system of the involved crane." (Doc. 48-2, p. 16.)

Consequently, Plaintiffs have produced sufficient evidence that Defendants had a duty to warn IP and operators of the crane of dangers Defendants reasonably should have known could arise from use of the crane including the maximum wind speed in which the crane could be safely operated and the minimum storm brakes necessary to safely operate the crane.  See Dozier Crane & Mach., Inc. v. Gibson, 644 S.E.2d 333, 336 (Ga. Ct. App. 2007) (refurbisher of crane "owed a duty to third persons to warn of the foreseeable dangers associated with its refurbished equipment, including the risk of electrocution").

### 2.  Defendants' Duty as Inspectors and Service Providers

As the inspectors and service providers of the crane, Defendants had a duty to exercise reasonable care in the performance of their undertakings.  See Argonaut Ins. Co. v. Clark, 267 S.E.2d 797, 799 (Ga. Ct. App. 1980).  Specifically, "Section 324A of the Restatement (Second) of Torts does provide for liability to third persons for negligent performance of an undertaking, and was adopted by the Georgia Supreme Court in Huggins v. Aetna Cas. & Sur. Co., 264 S.E.2d 191 (Ga. 1980)."  Bing v. Zurich Servs. Corp., 770 S.E.2d 14, 16 (Ga. Ct. App. 2015).  Section 324A provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 324A (1965).  "A defendant's 'duty may arise from contract or from undertaking actual inspections without a contract.'"  Manker, 556 F. App'x at 908 (quoting Sims v. Am. Cas. Co., 206 S.E.2d 121, 130 (Ga. Ct. App. 1974)).  Pertinently, when an employer (such as IP) relies upon an inspection company (such as Defendants) to perform inspection services, the inspection company owes the employer's employee (such as Mr. Hill) a duty to exercise reasonable care in the provision of inspection services.  Huggins, 264 S.E.2d at 192 ("It is thus clear that reliance by the employer . . . is sufficient to sustain a tort claim by the employee against the insurance company [that conducted an inspection of the plaintiff's workplace] and that the employee himself need not have so relied.").

Here, Defendants' duty to exercise reasonable care in their inspections and service of the crane arose out of their contract with IP as well as their undertaking of those tasks.  The record is

replete with evidence that crane owners like IP rely upon crane inspectors like Defendants to not only inspect equipment but also to prioritize repairs, warn if a safety issue exists, and recommend that the owner remove the crane from service when necessary.  Plaintiffs' experts explain:

> It is standard practice in the industry for a third[-]party crane inspection company (i.e. Konecranes) to perform inspections that identify conditions and deficiencies that require attention.  Further, when the third[-]party inspection company identifies conditions and/or deficiencies that require immediate attention prior to further operation, it is standard practice in the industry for the third[-]party inspection company to immediately notify the crane owner/user of the conditions as well as emphasiz[e] the urgency of the repairs.  For example, when the conditions of a crane affect the safe operation of the crane, it is incumbent on the inspection company to recommend to the crane owner or user that the equipment not be used until such repairs ae completed that would bring the crane back to a condition in which it is safe to operate the crane.  This is commonly referred to as red-tagging a crane, or removal from service.

(Doc. 48-2, pp. 15–16.)  Defendants' proposed expert agrees that inspection companies, like Defendants, have a duty to warn when a crane is "dangerous" and a customer "shouldn't be running it."  (Doc. 48-13, p. 10).

IP's reliance on Defendants was consistent with this industry practice.  Defendants agreed to "provide all supervision, labor, equipment and tools to perform inspections, maintenance and repair services to [IP's] overhead cranes, hoists, and wood yard cranes at [IP's] facilities." (Doc. 48–3, p. 1.)  Defendants' inspections specifically included the brakes, gears, and motors. (Id. at p. 11.)  Additionally, Defendants were required to provide formal periodic inspection reports to IP within ten business days of the inspection.  (Id.)  Importantly, the contract provided that "[w]hen emergency repairs are identified by the [Defendants'] inspection personnel, these shall be communicated immediately to the appropriate [IP] personnel in the impacted area."  (Id.)

Defendants testified that they are the "expert on cranes" and, therefore, were hired by IP to identify any problems, recommend repairs and replacement of parts, prioritize the severity of any repairs, and identify any emergency and safety hazards.  (Doc. 56-1, pp. 19, 20 ("We have the

responsibility that – to say if there's any safety hazards and – and prioritize those safety hazards on the crane.").)  Defendants further conceded that if one of their inspectors identify any needed repairs to a crane's storm brakes, those repairs could qualify as emergency repairs, and the inspector should immediately communicate any problems with the storm brakes to the crane owner.  (Id. at p. 15–16.)  Defendants also testified that they may recommend to a crane's owner that the crane be shut down until identified repairs are made, and that they have a classification code on their inspection report to indicate that the crane should be shut down.  (Id. at pp. 19–20, 50–51.)  Defendants' employee, Seth Perkins, admitted that if Defendants performed an inspection and found a crane "in the current condition a life-threatening situation, then we're going to let them know, Hey, our recommendation is to lock this out . . . ."  (Doc. 48-12, pp. 21–22.)[13]

Defendants' duty to warn arose not only from their contractual relationship with IP but also by way of Defendants' undertakings.  In 2014, Defendants performed five inspections on the crane with the last occurring in December of that year.  (Doc. 56-1, p. 17.)  Additionally, from January to June of 2015, Defendants' employees spent twelve to thirteen days at IP's plant repairing items that it identified in its December 2014 inspection of the crane.  (Id. at pp. 18, 31–36, 41–43.)  Defendants acknowledge (at least once while placed under oath) that IP relied upon Defendants to prioritize those repairs.  (Id. at p. 44 ("Q: . . . The priority of the work and repairs was to be

---

[13]  Throughout their briefs, Defendants emphasize that a crane owner has the ultimate authority to cease operating a crane or to conduct certain repairs.  (Doc. 32, p. 11 ("Konecranes cannot tell IP how to operate the Crane, or when to shut down."); doc. 63, pp. 5–6 ("**IP** is responsible of [*sic*] prioritizing the 'work performed on the crane . . . .'") (emphasis in original).)  Defendants miss the point.  Even where an equipment owner, like IP, makes the ultimate decision to remove equipment from service or to perform repairs, the record is replete with evidence that the owner relies upon the inspection, advice, and warnings of inspection companies, like Defendants, when making those decisions.  Even Defendants' proposed expert testified that "many times" during his career as a crane inspector he has told a company that its crane was in a condition that it should not be operated.  (Doc. 48-13, p. 10.)  IP relied upon Defendants to do the same.  Given such reliance, the owner's ultimate decision-making authority does not absolve the inspection company of its duty to exercise reasonable care.

prioritized by Konecranes; right?  A: That's – that's correct."); <u>see also</u> <u>id.</u> at p. 19 ("Q: And I understand that, ultimately, International Paper gets to choose which things they're going to do; but in terms of the priority, they are relying solely on Konecranes.  A: Yes.  On our – on our periodic inspections, we prioritize the severity of those repairs, yes sir.").)  Moreover, in March of 2015, after IP notified Defendants that one of the crane's storm brakes was broken, Defendants then arranged for IP to remove the storm brake from the crane and ship it to Defendants for an inspection.  (<u>Id.</u> at p. 36–38.)  Defendants testified that, at that point, given their involvement with the crane and knowledge regarding the crane's storm brakes, Defendants had "an obligation" to notify IP that the crane had at least one storm brake out of service and it "may have all storm brakes out of service" and "what . . . risks were associated with that."  (<u>Id.</u> at p. 56.)

IP's employee, Mr. Battle, confirms that IP relied upon Defendants to provide warnings about the crane, to inform IP of future and current needs in regards to repairs to the crane, to identify any hazardous conditions and safety issues, and to notify IP if any problem required the crane to not be operated or operated differently in both normal and storm conditions.  (Doc. 48-5, p. 8.)  Mr. Battle also testified that IP relied upon Defendants to tell IP if "a condition was unsafe and someone shouldn't operate the crane."  (<u>Id.</u>)  When asked, "if the crane could not operate safely, did you expect [Defendants] to tell you and International Paper, don't operate this crane?," Mr. Battle responded, "Absolutely."  (<u>Id.</u>)  Indeed, on at least three prior occasions, after identifying needed repairs to the crane, Defendants either told IP to "not operate the crane again until it's fixed" or recommended that repairs be completed within a short period of time. (<u>Id.</u> at pp. 9–10, 41.)  On those occasions, IP either shut down the crane or immediately had the problem repaired.  (<u>Id.</u> at p. 41.)  IP could have reasonably expected that Defendants would have provided

a similar warning regarding the dangerous condition of the storm brakes prior to Mr. Hill's fatal accident.

Based on all of the foregoing, Plaintiffs have produced sufficient evidence to support their argument that "Defendants had a duty to not only inspect and document the condition of the crane, but also to warn of dangerous and hazardous conditions, identify emergency repairs, and recommend IP lock out or stop operating the crane." (Doc. 48, pp. 15–16.)

### 3.  Learned Intermediary and Sophisticated User Doctrines

Defendants argue that they had no duty to warn IP of any hazards with the crane because IP was a "sophisticated user" or "learned intermediary." (Doc. 32, pp. 8–12.) As laid out below, under Georgia law, the sophisticated user and learned intermediary doctrines are separate concepts with distinct considerations. However, Defendants mistakenly use the phrases "sophisticated user" and "learned intermediary" interchangeably and treat them as one doctrine. (Id.; see also doc. 52, pp. 7–9.) For example, Defendants state "[f]or the sophisticated user/learned intermediary doctrine to apply, Defendants only needed to show that IP had sufficient knowledge of the hazards associated with Crane [sic]." (Doc. 32, p. 9.) Defendants also mix case law and arguments from these two doctrines, citing case law for one doctrine while referencing the other doctrine. (Id. at pp. 8, 9, 12.) This confusion inhibits Plaintiffs from fully responding to, and the Court from fully assessing, Defendants' arguments. This mistake provides an independent and sufficient basis for denying this portion of Defendants' Motion. Nonetheless, the Court will assess whether Defendants have established as a matter of law that either of these doctrines relieved them of their duties to warn of the dangers and hazards associated with the crane.

a.      **Learned Intermediary**

"Under the learned-intermediary rule, '[w]here the product is vended to a particular group or profession, the manufacturer is not required to warn against risks *generally* known to such group or profession.'" Fouch v. Bicknell Supply Co., 756 S.E.2d 682, 690 (Ga. Ct. App. 2014) (quoting Carter v. E.I. DuPont de Nemours & Co., 456 S.E.2d 661, 662 (Ga. Ct. App. 1995)).

As an initial matter, Defendants have not established that the learned intermediary doctrine applies to claims of the type that Plaintiffs assert here.  Putting aside Plaintiffs' claims against Defendants as the manufacturer of the modernized crane, Defendants have not cited to any case where a Georgia court has applied the learned intermediary doctrine to claims against an equipment inspector or service provider.  As explained above, Defendants' contract with IP to perform inspection and service tasks and their undertaking of those tasks gave rise to duties to warn distinct from those owed by a manufacturer.  Plaintiffs make no citation—and do not even offer any argument—that would explain how the learned intermediary doctrine nullifies those duties. Without any argument on this point from Defendants, the Court cannot extend the doctrine to apply to Plaintiffs' claims against Defendants as inspectors and service providers.

Further, even in the manufacturing context, the Georgia Court of Appeals has declined to extend the learned intermediary doctrine to claims similar to those made by Plaintiffs in this case. In Dozier Crane & Mach., Inc., 644 S.E.2d 333, the plaintiff construction workers suffered electrical shock while working with a refurbished crane that a general contractor had rented from the crane's owner.  The workers brought a negligence action against the defendant that had refurbished the crane and sold it to the owner.  644 S.E.2d at 334–35.  The workers claimed that the defendant refurbisher "owed them a duty to warn of latent dangers associated with the crane and that [the defendant] breached this duty by failing to apply signs warning of the dangers of

operating a crane near electrical power lines." Id. at 336.  The defendant refurbisher argued that it had no duty to warn of the risk for electric shock because the owner of the crane, a crane and rigging company, was a learned intermediary.  Id. at 335.  Without much discussion, the Georgia Court of Appeals held, "[t]hough we have applied the [learned intermediary] doctrine to limit liability in certain circumstances, we decline to extend it to this type of case."  Id. at 336.  Given that this is a similar "type of case" to Dozier, it appears that a Georgia court would not apply the learned intermediary doctrine to any of Plaintiffs' claims.  See also Long v. Amada Mfg. Am., Inc., No. 1:02-CV-1235, 2004 WL 5492705, at *19 (N.D. Ga. Mar. 31, 2004) ("Having reviewed the cases in Georgia analyzing the application of the 'Learned Intermediary' doctrine and having weighed and considered the above-mentioned factors in the context of this case, the Court is unwilling to extend this doctrine to equipment manufacturing cases.").

Even if the learned intermediary doctrine could theoretically apply to any of Plaintiffs' claims, genuine issues of material fact exist as to whether IP was aware of the dangers and hazards that Defendants allegedly failed to bring to IP's attention.  "A supplier's duty to warn a consumer does not turn on whether a warning was actually given to an intermediary, but on whether the intermediary's knowledge was sufficient to protect the ultimate consumer."  Stuckey v. N. Propane Gas Co., 874 F.2d 1563, 1568 (11th Cir. 1989).  The intermediary's "actual knowledge" is a "condition precedent" to the doctrine's application.  Stuckey, 874 F.2d at 1569.

Defendants cite select testimony from IP's employee Mr. Battle that IP was aware of the purpose of the storm brakes.  (Doc. 32, p. 10.)  However, as Plaintiffs point out, the record, including Mr. Battle's testimony, also contains evidence from which the jury could find that IP's employees were ignorant of or at least confused about the true purpose of the storm brakes.  For instance, Mr. Battle testified that he believed "the storm brakes were not intended for stopping the

crane" and he understood they were simply mechanical jacks used for maintenance and not for emergencies. (Doc. 48-5, pp. 6, 11.)

Regardless, even if IP had actual knowledge of the purpose of the storm brakes, a jury could still find that IP was unaware of dangers associated with the crane and that Defendants failed to inform IP of those dangers. For instance, Defendants testified that the maximum wind speed in which the crane could be operated safely is unique, IP would not have known the crane's maximum safe wind speed unless Defendants provided that information to IP, and Defendants never provided that information. (Doc. 56-1, p. 53.) Additionally, Defendants testified that, absent some information from Defendants—which Defendants did not provide—IP would not know the minimum number of storm brakes necessary to safely operate the crane and would not know that the crane should not be operated with more than one storm brake out per side. (Id. at p. 60.) Indeed, IP's former mechanical maintenance planner, David Faulkner, testified that he did not know how many storm brakes could be inoperable before the crane would be deemed inoperable. (Doc. 55-8, p. 10.) Moreover, a jury could also find that, following the 2014 inspection and until the accident in 2015, IP was unaware of the condition of the crane's storm brakes. After all, Defendants testified that that the condition of at least two of the storm brakes was unclear because Defendants failed to inspect and/or document them. (Doc. 56-1, pp. 27–30, 56.) Additionally, as explained above in detail, Defendants failed to provide the written report of the December 2014 inspection until after the fatal accident. (Id. at p. 42; doc. 48-2, p. 17; doc. 48-5, p. 17.) Further, it appears IP had no knowledge that the crane should be shut down until the storm brakes were fixed, that the needed repairs to the storm brakes constituted emergency repairs, that the repairs to the storm brakes should be prioritized over other repairs, or that the absence of operational storm brakes constituted a life threatening condition. As laid out above at length, IP relied upon

Defendants to provide them this information, and Defendants never did so.  (See, e.g., doc. 48-5, pp. 8, 34.)  Thus, the jury could find that IP did not have knowledge of the crane's condition and the risks associated with operating the crane in that condition sufficient to protect Mr. Hill.

Even if IP had "actual knowledge" of the relevant risks and dangers, that would not warrant summary judgment under the learned intermediary defense.  Defendants claim, "[f]or the sophisticated user/learned intermediary doctrine to apply, Defendants only needed to show that IP had sufficient knowledge of the hazards associated with Crane [sic]."  (Doc. 32, p. 9.)  Defendants are mistaken.  The Georgia Court of Appeals emphasized, "no case has ever held 'that the manufacturer may *always* rely on an intermediary to pass along to the ultimate user warnings of dangers inherent in the use of a product.'"  Fouch, 756 S.E.2d at 691 (quoting Carter, 456 S.E.2d at 663).  As explained by the Second Restatement of Torts,

> Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability.  It is merely a means by which this information is to be conveyed to those who are to use the chattel. The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it.

RESTATEMENT (SECOND) OF TORTS § 388 comment n (1965).[14]

Thus, "under the proper application of the 'learned-intermediary doctrine,'" before a Georgia court may find that a warning given to an intermediary satisfied a manufacturer's or supplier's duty to warn an ultimate consumer, the court must conduct a "balancing test of several factors: 'the burden of requiring a warning; the likelihood that the intermediary will provide a warning; the likely efficacy of such a warning; the degree of danger posed by the absence of such a warning; and the nature of the potential harm.'"  Fouch, 756 S.E.2d at 691 (quoting Carter, 456

---

[14]  As recognized by the Eleventh Circuit in Stuckey, 874 F.2d at 1568, the Georgia Court of Appeals adopted Section 388 of the Second Restatement of Torts in Beam v. Omark Ind., Inc., 237 S.E.2d 607, 611 (Ga. Ct. App. 1977).

S.E.2d at 664).  A court cannot grant summary judgment on the learned intermediary defense without a balancing of these factors, and summary judgment shall not be issued where factual issues exist as to the factors.  Id. (reversing grant of summary judgment on learned intermediary doctrine because "[t]his balancing [was not] undertaken in this case" and "serious questions of fact" existed as to plaintiff's employer's appreciation of hazards); Carter, 456 S.E.2d at 664 (reversing summary judgment on learned intermediary doctrine where parties failed to engage in balancing test).  Defendants have not acknowledged this balancing test, much less addressed the factors involved.  This failure provides yet another reason that the Court must reject their argument that they are entitled to summary judgment under the learned intermediary doctrine.

### b.    Sophisticated User

The sophisticated user doctrine "applies where it appears that the person using the product should know of the danger, or should in using the product discover the danger."  R & R Insulation Servs., Inc. v. Royal Indem. Co., 705 S.E.2d 223, 233 (Ga. Ct. App. 2010) (quoting Moore v. ECI Mgmt., 542 S.E.2d 115, 121 (Ga. Ct. App. 2000)).

Defendants argue that IP, as opposed to Mr. Hill, was a sophisticated user of the crane.  Some courts have recognized that "where it is highly impractical for the supplier to provide a warning directly to the end user, a variation of the sophisticated user defense has been developed that focuses on the sophistication of the end user's employer, on the premise that the employer will act in the best interest of its employees."  Gray v. Badger Mining Corp., 676 N.W.2d 268, 277 (Minn. 2004).  Courts have referred to this as the "'sophisticated intermediary' defense."  Id. However, "[s]ome courts have been reluctant to extend the rationale of the sophisticated user defense to sophisticated intermediaries."  Id. at 278 (citing Little v. Liquid Air Corp., 952 F.2d 841, 851 (5th Cir. 1992) and Donahue v. Phillips Petroleum Co., 866 F.2d 1008, 1013 (8th Cir.

1989)).  Moreover, those courts that have recognized the sophisticated intermediary defense also recognize that is entirely separate from the learned intermediary defense and, though it is a derivative of the sophisticated user doctrine, it requires showings and involves considerations distinct from that doctrine as well.  Id. at 275–78.

In this case, Defendants have not acknowledged the distinction between the traditional application of the sophisticated user doctrine and the application they request here.  They have not provided the Court with any argument as to whether a Georgia court would adopt the "sophisticated intermediary" doctrine or would otherwise apply the sophisticated user doctrine to an injured end user's employer.  Moreover, Defendants have also failed to recognize, much less address, the considerations that other courts have considered when applying the doctrine to an end user's employer.  These failures alone warrant the denial of this portion of Defendants' Motion.

Furthermore, even if Defendants had explained how the sophisticated user doctrine could apply to IP, that doctrine would apparently only be a defense to the claims against Defendants as manufacturers of the crane, not as the inspectors and servicers of the crane.  Defendants have not cited any case where a Georgia court has allowed a defendant other than a manufacturer or seller to assert the sophisticated user defense.  Further, such an application here appears illogical.  Where an equipment owner, like IP, hires an inspection company, like Defendants, to identify dangerous conditions in the owner's equipment, it would be nonsensical to assume that the owner should discover the conditions on its own and that the inspection company has no duty to notify the owner of the very conditions the owner hired the inspection company to identify.  Thus, it is not clear that the sophisticated user doctrine has any application in this case.

Additionally, even if the sophisticated user doctrine is applicable here, Defendants have failed to establish that the doctrine would entitle them to summary judgment.  "Whether a duty to

warn exists depends upon foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger.  Such matters generally are not susceptible of summary adjudication and should be resolved by a trial in the ordinary manner."  R & R Insulation Servs., Inc., 705 S.E.2d at 233 (quoting Omark Indus., Inc. v. Alewine, 319 S.E.2d 24, 25–26 (Ga. Ct. App. 1984)).

At the least, the record contains disputes of material fact about whether IP knew of the relevant dangers regarding the crane or should have discovered those dangers during its use of the crane.  As laid out above, Defendants have not indisputably established that IP knew about the defective condition of the crane, much less that IP appreciated the risks posed by its condition.  Defendants have also failed to conclusively prove that IP knew or should have known the dangers of operating the crane in a wind event or with storm brakes missing.  Again, Defendants themselves testified that IP would not have known the maximum wind speed in which the crane could be operated safely or the minimum number of storm brakes necessary to safely operate the crane unless Defendants provided that information.  (Doc. 56-1, pp. 53, 60.)  Further, the fact that IP paid Defendants to inspect the crane and to provide warnings to IP regarding the condition of the crane cuts against Defendants' depiction of IP as a sophisticated user that could have discovered such information on its own.

Moreover, a jury could find that Defendants should have foreseen that, absent a warning from Defendants, IP would not have known of the danger associated with the nonfunctional storm brakes and, thus, would continue to use the crane without functional storm brakes.  Defendants observed the crane being operated without storm brakes on numerous occasions, both during their inspections and while servicing the crane.  Defendants have even testified that they had actual knowledge that IP was operating the crane without storm brakes and that, therefore, they had an

obligation to notify IP that it should shut down the crane.  (Id. at p. 56.)  While Defendants point out other facts including that IP had their own service department, this evidence does not eliminate Defendants' duty to warn as a matter of law.  See, Gutierrez v. Hilti, Inc., 824 S.E.2d 391, 395 (Ga. Ct. App. 2019) (reversing grant of summary judgment where defendant supplier failed to provide installer full instructions and failed to provide setting tool necessary for proper installation of concrete construction anchors and rejecting supplier's argument that it had no duty to warn because installer was a "sophisticated user"); R & R Insulation Servs., Inc., 705 S.E.2d at 233–34 (finding that company's prior use of fiberglass reinforced panels, including conducting an in-house testing of such panels and potential installation methods, did not "transform[] [company] into a 'sophisticated user' or absolve[] [manufacturer], as a matter of law, of any duty to provide warnings about its recommended installation methods," and explaining that, "[w]hile questions exist concerning [company's] degree of knowledge of installation methods, which may have been more or less appropriate for its facility, we again do not find that the evidence presented . . . necessarily compels a finding that [manufacturer] owed no duty to investigate or warn in this instance").

For all of these reasons, even if Defendants had established that the sophisticated user doctrine could apply to this case, they have failed to establish that this case falls outside the rule that issues surrounding the doctrine "generally are not susceptible of summary adjudication and should be resolved by a trial in the ordinary manner."  Id. at 233 (quoting Omark Indus., Inc., 319 S.E.2d at 26).

**B.     Breach**

Defendants have not specifically addressed the element of breach in their Motion and have failed to identify any portions of the record which establish that there are no "genuine dispute[s]

as to any material fact" on this element.  <u>Moton</u>, 631 F.3d at 1341.  The most that Defendants have offered is the following single unsupported sentence, buried among arguments regarding causation: "Although Plaintiffs allege that Defendants were negligent, the record shows that Defendants did not breach any duty owed to the Decedent."  (Doc. 32, p. 7.)  This scant argument falls woefully short of showing that the record lacks evidence to support Plaintiffs' case as to breach or that the Plaintiffs would be unable to prove the element of breach at trial.  <u>See</u> <u>Moton</u>, 631 F.3d at 1341.  Because Defendants have not made such a showing, the burden does not shift to Plaintiffs to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist as to the element of breach.  <u>Anderson</u>, 477 U.S. at 257.

Nonetheless, Plaintiffs have pointed to more than sufficient evidence to survive summary judgment on the issue of breach.  Plaintiffs' experts opined that "[a]t some point, the deteriorating condition of the involved crane should have led [Defendants] to notify International Paper of the numerous deficiencies that needed to be repaired immediately and/or remove from service until the repairs were accomplished. Konecranes did not do so even though they had multiple opportunities to do so."  (Doc. 48-2, p. 18.)  The experts go on to explain that Defendants "failed to fulfill [their] duty" to "correctly identify and promptly warn against [deficiencies in the crane that required immediate attention and that should be repaired prior to further operation of the crane], particularly safety critical components such as the braking system of the involved crane;" "failed in their responsibilities to effectively warn International Paper that deficiencies for the involved crane required immediate attention and needed to be repaired accordingly;" and "failed in their responsibilities to remove the involved crane from service until the repairs were accomplished."  (<u>Id.</u> at pp. 19–20.)  In addition to these uncontested opinions, the record contains evidence that Defendants failed to fulfill their duties in at least in the following ways:

41

- Failing to define "high winds" in the operating manual or otherwise warn of the maximum wind speed at which the crane could be safely operated.  (Doc. 48-4; doc. 56-1, pp. 53–54, 61–62.)

- Failing to include a warning in the operating manual or otherwise of the minimum number of brakes necessary to safely operate the crane.  (Doc. 48-1, pp. 14–15; doc. 48-2 pp. 10–11; doc. 48-4.)

- Failing to warn, in the manual or otherwise, to not operate the crane with more than one storm brake out per side.  (Doc. 56-1, pp. 59–60; doc. 48-5, pp. 30–31.)

- Failing to inspect and/or document the condition of two of the crane's four storm brakes during any of the inspections in 2014.  (Doc. 56-1, pp.  27–30.)

- Failing to provide the itemized Crane Condition Detail report from the December 2014 inspection to IP until June 25, 2015, six months after the inspection and after Mr. Hill's death.  (Id. at p. 42; doc. 48-2, p. 17; doc. 48-5, p. 17.)

- Failing to use the highest safety classification as to the storm brakes or to otherwise warn IP at the conclusion of the December 2014 inspection that the condition of the storm brakes was a "life threatening condition."  (Doc. 48-2, pp. 17–19; doc. 56-1, pp. 20, 22, 30–31.)

- Failing to warn IP at the conclusion of the December 2014 inspection that IP should shut down the crane due to the condition of the storm brakes until the brakes were repaired.  (Doc. 48-2, pp. 17–19; doc. 48-5, pp. 9, 31, 41; doc. 56-1, pp. 19–20, 23, 30–31, 50–51.)

- Failing to immediately notify IP at the conclusion of the December 2014 inspection that needed repairs to the crane's storm brakes constituted "emergency repairs." (Doc. 48-2, pp. 17–19; doc. 56-1, pp. 14–16, 19.)

- Failing, when performing repairs to the crane in 2015, to prioritize repairs to the crane's storm brakes.  (Doc. 48-2, pp. 17–19; doc. 56-1, pp. 18, 31–36, 41–44.)

- Failing, when IP notified Defendants that one of the storm brakes was broken in March of 2015, to warn IP that the absence of the storm brake constituted a life-threatening condition, that the crane should not be operated until the storm brake was repaired or replaced, or to otherwise warn IP of the risks associated with the condition of the storm brakes.  (Doc. 48-2, pp. 17–19; doc. 48-5, pp. 9, 31, 41; doc. 56-1, pp. 36–41, 56.)

- Failing to offer IP a spare part when IP notified Defendants that one of the storm brakes was broken in March of 2015 and IP removed the storm brake to be inspected and repaired by Defendants.  (Doc. 56-1, pp. 40–41.)

- Failing to notify IP that the condition of the crane's storm brakes was a critical issue when asked by IP in April of 2015 to list critical issues that had not been repaired.  (Id. at pp. 43–44.)

- Failing, when working on the crane throughout the first six months of 2015 (including days before the incident), to warn IP that the problems with the storm brakes should be prioritized over the other repairs, that the storm brakes presented a life–threatening situation, or that the crane should be taken out of service until the storm brakes were repaired.  (Id. at pp. 18, 35–36.)

Consequently, the Court rejects Defendants' scant argument that Plaintiffs have no evidence that Defendants breached their duties as manufacturers and inspectors/servicers of the crane.

43

### C.       Causation

"To recover damages in a tort action, a plaintiff must prove that the defendant's negligence was both the 'cause in fact' and the 'proximate cause' of the injury." Atlanta Obstetrics & Gynecology Group, P.A. v. Coleman, 398 S.E.2d 16, 17 (Ga. 1990).   In order to show that a defendant's negligence is a cause in fact of a plaintiff's injuries, "the plaintiff ordinarily must prove that, but for this conduct, he would not have sustained the injury.   In other words, the defendant's conduct is not a cause of the event, if the event would have occurred without it." Yearty v. Scott Holder Enterps., Inc., 824 S.E.2d 817, 820–21 (Ga. 2019) (quoting Strength v. Lovett, 714 S.E.2d 723, 730 (Ga. Ct. App. 2011)) (internal alterations and citations omitted).

Defendants claim "[t]here is not one piece of evidence in this case that affirmatively states that Defendants were the proximate cause of the Incident." (Doc. 32, p. 5.)  Defendants' hyperbole is contradicted by the record.   Plaintiffs' experts opine that if Defendants had fulfilled their obligations regarding the crane, "the incident involving Mr. Hill would not have occurred." (Doc. 48-2, pp. 18, 20.)  Further, one expert testified that a post-accident inspection revealed that only one of the crane's storm brakes functioned properly during the incident and that Defendants' failure to inform IP of the severity of the lack of the storm brakes was the "primary cause" of the accident.  (Doc. 48-8, pp. 7–9.)  Defendants have not challenged any of these opinions.  Moreover, Mr. Battle testified that: IP expected Defendants to tell IP if the crane could be operated safely and relied upon Defendants to do so, (doc. 48-5, p. 8); IP trusted Defendants' statements in the manual and would have heeded any warnings regarding wind speed and storm brakes if Defendants had included those warnings in the manual, (id. at p. 30); Defendants never told him or anyone from IP not to operate the crane with more than one storm brake out per side before the incident, (id. at pp. 30–31); and if Defendants had notified him that storm brakes were a priority and needed to be

repaired immediately, IP would have done so, (id. at pp. 31, 34).  Mr. Battle also testified that, on

prior occasions, when Defendants told IP not to operate the crane or to conduct a needed repair

immediately, IP heeded those warnings.  (Id. at pp. 9–10, 41.)  When placed under oath,

Defendants acknowledged the causal connection between their failure to warn as to the storm

brakes and Mr. Hills' fatal accident.  During Defendants' deposition, Plaintiffs' counsel queried

whether they agreed that, had they told IP prior to the accident that the crane should not be operated

with more than one storm brake out per side, they "could have prevented this incident, if [IP]

complied with it."  (Doc. 56-1, p. 59.)  Defendants responded, "[c]ertainly."  (Id.)

As for "proximate cause," the concept is difficult to neatly define or to divide into certain

elements.  As the Supreme Court of Georgia has explained:

> The requirement of proximate cause constitutes a limit on legal liability; it is a
> policy decision that, for a variety of reasons, e.g., intervening act, the defendant's
> conduct and the plaintiff's injury are too remote for the law to countenance
> recovery.  Although many legal scholars have attempted to lay down a single
> standard to determine proximate causation, no satisfactory universal formula has
> emerged.  Instead, proximate cause is always to be determined on the facts of each
> case upon mixed considerations of logic, common sense, justice, policy and
> precedent.  . . .  Thus, whether proximate cause exists in a given case is a mixed
> question of law and fact.  It requires both fact-finding in the "what happened" sense,
> and an evaluation of whether the facts measure up to the legal standard set by
> precedent.  Ordinarily, both determinations are most appropriately made by a jury
> upon appropriate instructions from the judge.

Atlanta Obstetrics & Gynecology Group, P.A., 398 S.E.2d at 17 (citations and quotations omitted).

Without any explanation, Defendants claim that the crane accident "was not reasonably

foreseeable by the Defendants on December 15, 2014," (doc. 32, p. 5), and that the event was

"unlikely, remote, slightly probable, or slightly possible," (id. (quoting Davis v. Blockbuster, Inc.,

575 S.E.2d 1, 2–3 (Ga. Ct. App. 2002))).  True to form, Defendants do not cite any record evidence

or provide any analysis of the facts of this case to support this cursory argument.  (See id. at pp.

5–6.)  Once again, this failure provides sufficient reason to reject Defendants' argument.

Moreover, particularly given the above-discussed evidence of IP's reliance upon Defendants, the jury could find it foreseeable that Defendants' failures would cause IP to operate the crane in an unsafe condition. Indeed, IP's operation of the crane in an unsafe condition was not only foreseeable to Defendants but known by them. (Doc. 56-1, pp. 39–41.) Further, the causal connection between the fatal accident and Defendants' failures, both before and well after December 15, 2014, is quite straightforward. The storm brakes were designed to prevent the very type of accident that occurred. It was entirely foreseeable that Defendants' repeated failure to apprise IP of the condition of those brakes and to warn IP of the dangers of operating the crane without those brakes functioning properly would result in such an accident.

Defendants also claim that an intervening act, not their own negligence, proximately caused the accident. (Doc. 32, pp. 6–8 ("IP's Intervening Act's [sic] or Omission's [sic] Were the Proximate Cause of the Incident.").) Under certain conditions, an intervening unforeseeable causal act of someone other than a defendant can prevent a finding that the defendant's negligence was the proximate cause of a plaintiff's injuries.

> Inextricably entwined with concepts of negligence and proximate cause is a notion of foreseeability. To that end, the well-established doctrine of intervening causes states that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent act or omission of someone other than the defendant, which was not *foreseeable* by defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury.

City of Richmond Hill v. Maia, 800 S.E.2d 573, 576–77 (Ga. 2017) (citation and punctuation omitted; emphasis in original) (quoting Brandvain v. Ridgeview Inst., Inc., 372 S.E.2d 265, 272 (Ga. Ct. App. 1988) and McQuaig v. McLaughlin, 440 S.E.2d 499, 502–03 (Ga. Ct. App. 1994)).

Perplexingly, in their opening brief, Defendants never identify the supposed intervening act or omission. (Doc. 32, pp. 6–8.) Rather, Defendants speculate that "[w]hatever actually caused

the Incident, poorly operating the crane, a weather event, or faulty maintenance, was an intervening act by IP or the Decedent."  (Id. at p. 6.)  In essence, Defendants throw up their hands and argue "it must have been someone else's fault."[15]  This argument falls woefully short of proving that an intervening act broke the causal connection as a matter of law.  See Atlanta Obstetrics & Gynecology Group, P.A., 398 S.E.2d at 17–18 (proximate cause will only be decided by the court as a matter of law in "plain and undisputed cases") (quoting McAuley v. Wills, 303 S.E.2d 258, 261 (Ga. 1983)).  In their Reply brief, Defendants list acts and omissions that they contend are "slam dunk negligence cases against IP."  (Doc. 52, p. 6.)  However, Defendants cannot raise arguments in their Reply brief that they failed to raise in their original brief.  Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 682–83 (11th Cir. 2014).

Even if Defendants could belatedly raise these alleged intervening causes, their arguments nonetheless miss the mark.  They fail to address, much less establish as a matter of law, any of the prerequisites for an intervening cause.  Foremost, in order for an intervening act to negate proximate cause, the act must have been "not foreseeable by defendant."  City of Richmond Hill, 800 S.E.2d at 577.  The jury could find all of IP's acts and omissions foreseeable to Defendants particularly given evidence that Defendants actually knew of all of those acts and omissions prior to Mr. Hill's death.  As laid out above, Defendants knew that the crane had storm brakes missing and knew that IP was operating the crane without those brakes.  Defendants even admitted that, in light of that information, they had an obligation to notify IP of the risks associated with the crane's condition, but they failed to do so.  (Doc. 56-1, p. 56.)  Additionally, while Defendants point to IP's failure to allow them to conduct quarterly inspections in 2015, they also concede "it is not

---

[15]  Within their argument stating that an intervening act other than their own negligence caused the incident, Defendants confusingly state "it is not essential to determine the exact cause of the Incident at this juncture . . . ."  (Doc. 32, p. 7.)  The Court is not aware of any precedent holding that an *unknown* act can somehow be the intervening cause of a plaintiff's injuries.

uncommon to cancel a quarterly inspection." (Id. at p. 17.)  Further, Defendants were aware of the lack of quarterly inspections of the crane in 2015, as their representatives had discussed the issue internally.  (Id. at p. 44.)

The jury could also find that IP's acts and omissions were not "independent" of Defendants' negligence.  See City of Richmond Hill, 800 S.E.2d at 577.  Defendants admit that they did not notify IP that the quarterly inspections of the crane in 2015 should take place regardless of ongoing repairs or that the crane should be shut down until the repairs were made.  (Doc. 56-1, p. 45.)  Also, while Defendants point the finger at IP for not repairing the storm brakes, IP hired Defendants to conduct a number of repairs to the crane in 2015 including days before the incident, IP relied upon Defendants to prioritize the needed repairs, and Defendants did not prioritize the storm brakes over other repairs.  (Id. at pp. 18, 31–36, 41–44.)  Defendants even testified that IP was not aware of which storm brakes were working on the date of the incident because Defendants failed to properly document and/or inspect them.  (Id. at p. 56.)  Given IP's reliance on Defendants, and Defendants' repeated failure to timely advise IP of the condition of the storm brakes and Defendants' continued failure to inform IP of the danger posed by the lack of storm brakes, the jury could find that IP's use of the crane without storm brakes and other acts and omissions were "triggered by defendant's act."   City of Richmond Hill, 800 S.E.2d at 577.

Additionally, the jury could find that IP's acts and omissions were not "sufficient of [themselves] to cause the injury."  Id.  For instance, the jury could find that the failure to schedule inspections in 2015 played no causal role because the accident would have occurred even if the inspections had taken place.  After all, Defendants' prior inspections, including the December 2014 inspection, did not prevent the accident.  During and after those inspections, Defendants failed to properly inspect and/or document deficiencies with the storm brakes, failed to properly prioritize

needed repairs to the storm brakes, failed to identify the condition of the storm brakes as a life-threatening condition, and failed to warn Defendants to not operate the crane until the storm brakes were fixed.  Defendants did even not provide a written report of their December 2014 inspection until months after that inspection.  (Doc. 56-1, p. 42; doc. 48-5, p. 17.)  It is "wholly uncertain" whether Defendants would have performed any better if IP had required them to inspect the crane in 2015.  Yearty, 824 S.E.2d at 821 ("As we have held, no inference of fact may be drawn from a premise which is wholly uncertain.") (quoting Ogletree v. Navistar Int'l Transp. Corp., 535 S.E.2d 545, 550 (Ga. Ct. App. 2000)).  Defendants have not indisputably established that an inspection in 2015 would have prevented what Defendants' prior inspections failed to prevent, and they have failed to otherwise show, as a matter of law, that IP's acts and omissions were sufficient in and of themselves to cause the fatal crane accident.

On the whole, Plaintiffs have failed to demonstrate that this case is one of the "plain and undisputed cases" where the Court should decide the issue of proximate cause on summary judgment.  Rather, upon facts similar to (and even more favorable to defendants than) those involved in this case, Georgia courts have rejected defendants' requests for summary judgment and repeatedly found that "questions regarding proximate cause are 'undeniably a jury question.'" Ontario Sewing Mach. Co. v. Smith, 572 S.E.2d 533, 536 (Ga. 2002) (quoting Atlanta Obstetrics & Gynecology Group, P.A., 398 S.E.2d at 18).  In Ontario Sewing Mach. Co., the defendant manufacturer of a yarn cutting machine sent a recall notice to the plaintiff's employer notifying the employer that the machine had caused injuries and warning the employer to stop using the machine.  572 S.E.2d at 534.  The employer continued using the machine, and the plaintiff employee was severely injured by it.  Id.  The employee sued the manufacturer, and the trial court granted summary judgment on the basis that the employer's failure to stop using the machine after

the recall constituted an intervening act that was the sole proximate cause of the plaintiff's injuries. Id.  The Georgia Court of Appeals reversed the trial court's decision, and the Georgia Supreme Court affirmed that reversal.  Id. at 535–36.  The Supreme Court explained "it [was] not plain and undisputed that [the manufacturer] [was] or [was] not the proximate cause of [the plaintiff's] injuries" because fact issues existed regarding "the reasonableness of [the manufacturer's] recall [warning] and the foreseeability of whether [the employer] would comply with it."  Id. at 536. Thus, it was for the jury to determine if the plaintiff's injuries were proximately caused solely by the employer's acts, solely by the manufacturer's acts, or by a combination thereof.  Id.; see also Pepper v. Selig Chem. Indus., 288 S.E.2d 693, 696 (Ga. Ct. App. 1982) (reversing grant of summary judgment to chemical manufacturer on failure to warn claims because jury questions remained as to whether seller's "actions in rebottling the product without any apparent knowledge of the combustibility of the product were so preponderate in causing [plaintiff's] injury as to insulate [manufacturer] from liability for failure to supply a sufficient warning.").  Likewise, it will be for the jury, not the Court, to determine if Mr. Hill's death was caused solely by Defendants' acts and omissions, solely by IP's acts and omissions, or by a combination thereof.

## CONCLUSION

For all of the above stated reasons, the Court **DENIES** Defendants' Motion for Summary Judgment.

**SO ORDERED**, this 16th day of June, 2020.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA